**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RUSSELL ROUNDTREE,** | : | **Civil Action No. _____** |
| **Plaintiff,** | : | |
| **v.** | : | **Jury Trial Demanded** |
| **CITY OF PHILADELPHIA,** | : | |
| **CORRECTIONAL OFFICER CHAN,** | : | |
| **individually and in his official capacity;** | : | |
| **JOHN DOE, Correctional Officer,** | : | |
| **individually and in his official capacity;** | : | |
| **Defendants.** | : | |

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff, Russell Roundtree, by and through his attorneys, Levin and Zeiger, LLP, brings this civil rights action pursuant to 42 U.S.C. § 1983 against the above-named Defendants and alleges as follows:

**I. INTRODUCTION**

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff was a pretrial detainee incarcerated at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia, Pennsylvania, when he was brutally attacked twice by approximately fifteen (15) to twenty (20) inmates within ten (10) to fifteen (15) minutes of each other on October 20, 2025. Correctional Officer Chan stood by and allowed these violent attacks to occur without intervening. As a direct and proximate result of Defendants' deliberate indifference and failure to protect, Plaintiff suffered severe and permanent injuries, including multiple closed fractures of his facial bones, a ruptured globe of his right eye, fractures of the right orbital floor and right maxillary sinus, nasal bone fractures, and other

serious injuries requiring emergency hospitalization, two (2) surgical procedures, and the implantation of titanium bone plates and screws.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction), as this action arises under 42 U.S.C. § 1983 for violations of the Constitution and laws of the United States.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within the Eastern District of Pennsylvania.

## III. PARTIES

5. Plaintiff Russell Roundtree is an adult individual who, at all times relevant hereto, was a citizen of Philadelphia, who was incarcerated at the Curran-Fromhold Correctional Facility in Philadelphia, Pennsylvania.

6. Defendant John Doe is an unknown correctional officer employed by the City of Philadelphia, who was responsible for the supervision and safety of inmates at CFCF on October 20, 2025. John Doe is sued in both his individual and official capacities.

7. Defendant Correctional Officer Chan is a correctional officer employed by the City of Philadelphia, who was responsible for the supervision and safety of inmates at CFCF on October 20, 2025. Correctional Officer Chan is sued in both his individual and official capacities.

8. Defendant City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania. The City of Philadelphia owns, operates, and maintains the

Philadelphia Department of Prisons, which includes the Curran-Fromhold Correctional Facility. The City of Philadelphia is responsible for the policies, practices, and customs governing the operation and staffing of its correctional facilities and the safety and welfare of persons incarcerated therein.

<b><u>IV. FACTUAL ALLEGATIONS</u></b>

**<u>A. The Attacks on Plaintiff</u>**

9. On or about October 20, 2025, Plaintiff Russell Roundtree was incarcerated at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia, Pennsylvania.

10. On that date, at approximately 11:01 PM, Plaintiff was attacked by a group of approximately fifteen (15) to twenty (20) inmates at CFCF.

11. The first attack was vicious and involved multiple assailants who struck Plaintiff repeatedly about the face and body.

12. Within approximately ten (10) to fifteen (15) minutes of the first attack, Plaintiff was attacked a second time by approximately the same group of fifteen (15) to twenty (20) inmates.

13. At the time of both attacks, Correctional Officer Chan was present and in a position to observe the assaults upon Plaintiff.

14. Despite witnessing the attacks, Correctional Officer Chan stood by and allowed the incidents to occur without intervening, calling for assistance, or taking any action to protect Plaintiff from harm.

15. Correctional Officer Chan's failure to act was deliberate and constituted a conscious disregard for Plaintiff's safety and well-being.

16. Upon information and belief, other correctional officers, including John Doe Defendant(s), also failed to take reasonable steps to prevent the attacks or to protect Plaintiff from the known risk of violence.

## B. Plaintiff's Injuries and Medical Treatment

17. Following the attacks, police transported Plaintiff to Jefferson Northeast Torresdale Hospital, located at 10800 Knights Road, Philadelphia, PA 19114, where he arrived at the Emergency Department on October 20, 2025, at 11:01 PM.

18. At Jefferson Torresdale Hospital, Plaintiff was evaluated and found to have suffered severe and life-altering injuries as a result of the attacks, including but not limited to:

    a.    Facial trauma, initial encounter (ICD-10: S09.93XA)

    b.    Ruptured globe of the right eye, initial encounter (ICD-10: S05.31XA)

    c.    Multiple closed fractures of the facial bones, initial encounter (ICD-10: S02.92XA)

    d.    Closed fracture of the right maxillary sinus (ICD-10: S02.40CA)

    e.    Closed fracture of the right orbital floor (ICD-10: S02.31XA)

    f.    Nasal bone fractures (ICD-10: S02.2XXA)

    g.    Injury of globe of eye, right, initial encounter (ICD-10: S05.91XA)

    h.    Right arm pain (ICD-10: M79.601)

19. Due to the severity of his injuries, Plaintiff was admitted as an emergency inpatient on October 21, 2025, to the Intermediate Intensive Care Unit under the Surgery–Trauma service, with Sriharsha Gummadi, MD, as his admitting physician.

20. During the course of his hospitalization, Plaintiff underwent extensive diagnostic imaging on October 21, 2025, including CT scans of the head and brain, facial bones, cervical spine,

thorax, and abdomen and pelvis, as well as CT angiography of the head and neck, and a chest X-ray.

21. On October 22, 2025, Plaintiff underwent his first surgical procedure: open reduction and internal fixation ("ORIF") of his facial fractures in Operating Room JTH OR 06. This surgery was performed by Austin Hale, MD, of Oral and Maxillofacial Surgery, and involved the implantation of a Plate Medium .8mm Midface Orbital Floor 12 Hole Insert with Maxdrive 1.5mm Micro Screw Osteosynthesis Bone Level One Titanium hardware on the right side of Plaintiff's face.

22. On October 23, 2025, Plaintiff underwent a second surgical procedure in Operating Room JTH OR 04, again performed by Dr. Hale, which involved the implantation of additional titanium hardware, including a Plate Medium Straight .8mm Midface 24 Hole Insert with Maxdrive 1.5mm Micro Screw on the right face and twenty-seven (27) Screw Bone 1.5mm 5mm Level One Onedrive Titanium Aluminum Vanadium Craniomaxillofacial screws on the right face. All hardware was manufactured by KLS Martin LP.

23. During his hospitalization, Plaintiff also received ophthalmology consultations from I C Laser Eye Care and Soll Eye Associates for the ruptured globe of his right eye. Plaintiff was further incidentally found to have an aneurysm of the ophthalmic segment of the right internal carotid artery, necessitating future neurosurgery follow-up and MRI imaging.

24. Plaintiff's hospitalization required pain management including hydromorphone, oxycodone, fentanyl, ketamine, acetaminophen, ketorolac, ibuprofen, and gabapentin, as well as multiple antibiotic and anti-infective medications including ampicillin-sulbactam, cefazolin, erythromycin, metronidazole, and amoxicillin-clavulanate. Plaintiff further required DVT

prophylaxis with enoxaparin, anti-inflammatory treatment with dexamethasone, and various other medications throughout his eight (8) day hospital stay.

25. Plaintiff was discharged from Jefferson Torresdale Hospital on October 28, 2025, and instructed to follow up with multiple specialists, including Austin Hale, MD, for Oral and Maxillofacial Surgery on November 4, 2025; Michael R. Gooch, MD, for Neurosurgery for the incidental aneurysm finding with MRI imaging recommended within six (6) months; I C Laser Eye Care for ophthalmology follow-up for the ruptured globe of his right eye; and Mohammed A. Haque, MD, for internal medicine and primary care.

26. Plaintiff continues to suffer from the injuries sustained in the attacks and faces ongoing medical treatment, future surgeries, and the permanent consequences of his injuries, including but not limited to permanent scarring, disfigurement, loss or impairment of vision in his right eye, titanium hardware permanently implanted in his facial bones, an incidental aneurysm requiring long-term monitoring, chronic pain, emotional distress, and diminished quality of life.

## C. The City of Philadelphia's Known Pattern of Understaffing and Failure to Protect

27. The City of Philadelphia has long been on notice that its correctional facilities, including CFCF, are dangerously understaffed and that this understaffing creates a substantial risk of serious harm to incarcerated persons.

28. In April 2020, a class action lawsuit was filed against the City of Philadelphia in this Court, captioned Remick et al. v. City of Philadelphia, No. 2:20-cv-01959 (E.D. Pa.), alleging inhumane conditions inside the Philadelphia jails, including inadequate staffing and dangerous conditions of confinement.

29. In 2022, the City of Philadelphia entered into a settlement agreement in Remick, in which it agreed to take all reasonable steps to address chronic staffing shortages and to ensure minimum out-of-cell time and adequate conditions of confinement for incarcerated persons.

30. Despite this settlement agreement, the City of Philadelphia failed to comply with its terms. The staffing crisis in Philadelphia's jails worsened rather than improved, with approximately forty-seven percent (47%) of correctional officer positions remaining vacant, amounting to approximately eight hundred (800) unfilled positions.

31. As a direct result of this severe understaffing, incarcerated persons were locked in their cells for twenty-three (23) hours a day or more, contraband flowed freely through the facilities, and violent incidents including stabbings, assaults, and deaths became commonplace.

32. On July 12, 2024, the Honorable Gerald A. McHugh, United States District Judge for the Eastern District of Pennsylvania, held the City of Philadelphia in contempt of the 2022 settlement agreement in Remick, finding that it was "virtually undisputed" that the City was not in compliance with the staffing and out-of-cell time requirements of the agreement.

33. Judge McHugh ordered the City of Philadelphia to pay Twenty-Five Million Dollars ($25,000,000.00) into a dedicated fund to be used immediately to address the staffing crisis, including hiring an outside recruitment firm and offering double-time pay to fill vacant shifts.

34. Judge McHugh further barred the City from reducing the Philadelphia Department of Prisons' budget to recoup the $25 million, underscoring the severity and urgency of the staffing crisis.

35. Despite this contempt finding and the $25 million sanction, the City of Philadelphia continued to operate its correctional facilities, including CFCF, in a dangerously understaffed manner that placed incarcerated persons at a substantial risk of serious harm.

36. The attack on Plaintiff on October 20, 2025, more than fifteen (15) months after Judge McHugh's contempt order, demonstrates that the City of Philadelphia has failed to remedy the conditions that led to the contempt finding and that incarcerated persons continue to face an unreasonable risk of violence due to the City's deliberate indifference.

**D. Philadelphia's Historic Lack of Protections for Inmates**

37. The City of Philadelphia has a history of understaffing and failing to protect inmates like Plaintiff from known, dangerous inmates, failing to monitor inmates for inmate safety, and failing to ensure that security protocols are being followed to ensure inmate safety.

    a. In July of 2018, in *Simmons v. Philadelphia*, 22-cv-1644, Simmons was assigned to a cell in the Philadelphia Prison System with a paranoid schizophrenic, Jessie Wilson, who had a history of physical and verbal abuse of Simmons. Simmons reported the abuse, but of course, the claim fell upon deaf ears. Simmons remained in a cell with Wilson, who brutally assaulted and raped Simmons throughout the night after his complaints. Wilson was placed or should have been placed in segregation at the time of the assault on Simmons. He was not.

    b. In August of 2019, Frankie Diaz, Jr. died of injuries after being beaten by another prisoner in the Philadelphia Prison System. https://www.prisonlegalnews.org/news/2022/aug/1/filth-fury-philly-jails-descend-murderous-chaos/. The inmate who beat Diaz to death had a violent history while incarcerated. The inmate who beat Diaz to death was involved in a significant fight and/or altercation with Diaz and, as a result, was placed or should have been placed in segregation at the time of the assault on Diaz. He was not.

c.  In January of 2021, Dale Curbeam was found dead face down in his cell at Curran Fromhold Correctional Facility ("CFCF"), a prison within the Philadelphia Prison System. His cellmate was arrested for the murder. According to the Philadelphia Inquirer, only one correctional officer was stationed in the Pod at the time of the

homicide. https://www.inquirer.com/news/homicide-philadelphia-jails-violence- covid-pandemic- lockdowns-20210120.html.

d.  In April of 2022, Christopher Hinkle was incarcerated at CFCF when another inmate attacked him, resulting in a broken neck and other blunt-force injuries. The guards did not find Hinkle until at least four hours later. Once found, it was too late, he was put on life support, eventually succumbing to his injuries. Hinkle was a non-violent offender. Hinkle's cellmate had a long record of random assaults and violent criminal offenses and, as a result, was placed or should have been placed in segregation at the time of the assault on Hinkle. He was not.

e.  On September 30, 2021, an unknown inmate at CFCF was brutally attacked and stabbed by three inmates. No guards came to his aid. The inmate suffered serious life-threatening injuries.

f.  In March of 2021, Armani Faison was incarcerated at CFCF. He was assigned to a cell with known, dangerous inmate Kevin Massey. Massey had sexually assaulted another inmate earlier that day. In response to the sexual assault, Massey was not placed in administrative or disciplinary segregation. That other inmate was moved out of the cell with Massey. Faison was moved into the cell with Massey mere hours after Massey sexually assaulted the other inmate. Massey repeatedly raped,

beat, and choked Faison. Faison's body was found the next morning, naked, bloodied, floating in six inches of water. He was transported to Nazareth Hospital and pronounced dead that morning. As a result of his prior conduct, Massey was placed or should have been placed in segregation at the time of the assault on Faison. He was not.

g.  On or about August 11, 2022, Anthony Autry was attacked at PICC by other inmates. The corrections officers working that day knew of other inmates on the block who was not properly categorized for housing who had a propensity for using weapons and assaulting other inmates. As a result of the ensuing attack, Plaintiff was severely injured. *See Autry v. City of Philadelphia,* 2:23-cv-01501-PD.

**V. CLAIMS FOR RELIEF**
**COUNT I**
**42 U.S.C. § 1983 – FAILURE TO PROTECT**
**(Against Correctional Officer Chan and Doe)**

38. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

39. At all times relevant hereto, Correctional Officers Chan and Doe were acting under color of state law as an employee of the City of Philadelphia.

40. As a correctional officer at CFCF, Defendants Chan and Doe had a duty to protect Plaintiff from violence at the hands of other inmates.

41. Defendants Chan and Doe knew of and disregarded a substantial risk to Plaintiff's health and safety by standing by and allowing approximately fifteen (15) to twenty (20) inmates to attack Plaintiff not once, but twice within a span of ten (10) to fifteen (15) minutes.

42. Defendants Chan and Doe's deliberate indifference to Plaintiff's safety constituted a violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution, as applied to pretrial detainees.

43. As a direct and proximate result of Defendants Chan and Doe's deliberate indifference, Plaintiff suffered the severe and permanent injuries described herein.

<u>**COUNT II**</u>
**42 U.S.C. § 1983 – MONELL CLAIM**
**(Against the City of Philadelphia)**

44. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

45. The City of Philadelphia is a "person" subject to suit under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

46. The City of Philadelphia, through its policymakers, maintained and enforced policies, practices, and customs that were the moving force behind the constitutional violations suffered by Plaintiff, including but not limited to:

   a. A policy, practice, or custom of failing to hire, train, and retain a sufficient number of correctional officers to safely operate its correctional facilities, including CFCF;

   b. A policy, practice, or custom of operating correctional facilities with staffing levels so deficient that officers are unable to monitor inmate populations, respond to violent incidents, or protect incarcerated persons from foreseeable attacks;

   c. A policy, practice, or custom of deliberate indifference to the known and obvious risk of violence to incarcerated persons caused by chronic understaffing;

   d.   A policy, practice, or custom of failing to adequately train and supervise correctional officers in the protection of incarcerated persons and the prevention and intervention of inmate-on-inmate violence;

   e.   A policy, practice, or custom of failing to implement adequate security measures, including proper monitoring, surveillance, and staffing ratios, to prevent foreseeable acts of violence.

47. The City of Philadelphia had actual and constructive knowledge of the dangerous conditions created by its chronic understaffing. As established in *Remick et al. v. City of Philadelphia*, No. 2:20-cv-01959 (E.D. Pa.), the City was found to be in contempt of a 2022 settlement agreement by the Honorable Gerald A. McHugh on July 12, 2024, and was ordered to pay $25,000,000.00 for its failure to comply with staffing requirements. Judge McHugh found that the City's forty-seven percent (47%) correctional officer vacancy rate created conditions in which incarcerated persons were subjected to prolonged lockdowns, rampant contraband, drug overdoses, and serious physical injuries from violent assaults.

48. Despite the contempt finding and the $25 million sanction, the City of Philadelphia failed to remedy the staffing crisis and continued to operate its correctional facilities in a manner that placed incarcerated persons, including Plaintiff, at a substantial risk of serious harm.

49. The City's failure to protect Plaintiff was not an isolated incident but was the direct and foreseeable consequence of the City's longstanding and well-documented pattern of understaffing and deliberate indifference to the safety of incarcerated persons.

50. The policies, practices, and customs of the City of Philadelphia were the moving force behind the violations of Plaintiff's constitutional rights and the injuries he sustained on October 20, 2025.

## VI. DAMAGES

51. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered and continues to suffer the following damages:

    a.    Past and future medical expenses, including but not limited to emergency treatment, two (2) surgical procedures involving the implantation of titanium bone plates and twenty-seven (27) surgical screws, hospitalization totaling eight (8) days at Jefferson Northeast Torresdale Hospital, ophthalmology consultations for ruptured globe of the right eye, neurosurgery follow-up for an incidental aneurysm of the right internal carotid artery, and ongoing follow-up care with multiple specialists;

    b.    Severe physical pain and suffering, past and future;

    c.    Permanent scarring and disfigurement of the face;

    d.    Loss or impairment of vision in the right eye due to ruptured globe;

    e.    Permanent implantation of titanium bone plates and twenty-seven (27) surgical screws in the facial bones;

    f.    An incidental aneurysm of the ophthalmic segment of the right internal carotid artery requiring long-term monitoring and potential future surgical intervention;

    g.    Emotional distress, mental anguish, anxiety, depression, fear, humiliation, and loss of enjoyment of life;

    h.    Past and future lost wages and diminished earning capacity;

    i.    Any and all other damages permitted by law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Russell Roundtree respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

    a.    Compensatory damages in an amount to be determined at trial;

    b.    Punitive damages against Defendants Chan and John Doe in an amount sufficient to punish and deter such conduct;

    c.    Pre-judgment and post-judgment interest as allowed by law;

    d.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

    e.    Such other and further relief as this Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**LEVIN AND ZEIGER, LLP**

By: /s Brian J. Zeiger

Brian J. Zeiger, Esquire
Attorney for Plaintiff
1500 John F. Kennedy Blvd.
Suite 800
Philadelphia, PA 19102

Dated: March 26, 2025